**DiGIANNANTONI, Appellee,**

**v.**

**WEDGEWATER ANIMAL HOSPITAL, INC., Appellant.**

[Cite as *DiGiannantoni v. Wedgewater Animal Hosp., Inc.* (1996), 109 Ohio App.3d 300.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 95APE09–1128.

Decided Feb. 13, 1996.

302

*Arnold E. Shaheen, Jr.*, for appellee.

*Bidwell & Beachler Co., L.P.A.*, and *Jinx Statler Beachler*, for appellant.

*Louis A. Jacobs; Spater, Gittes, Schulte & Kolman* and *Frederick M. Gittes*, for *amici curiae*.

---

PEGGY BRYANT, Judge.

Appellant, Wedgewater Animal Hospital, Inc., appeals from a judgment of the Franklin County Court of Common Pleas, which reversed the Unemployment Compensation Board of Review's decision to deny benefits to appellee, Sherry A. DiGiannantoni. Appellant assigns a single error:

"The court of common pleas erred in holding that Sherry DiGiannantoni quit with just cause according to R.C. 4141.29(d)2(a) [*sic* ], in its decision."

Appellant is owned and operated by Michael E. Dillon, DVM. Appellee began working for appellant on December 27, 1987; she was employed there as a surgical nurse and a receptionist.

On December 17, 1993, Dillon chastised appellee for not completing a work assignment which he had supposedly given her twice within a two-week period. Appellee denied that he had asked her to complete the assignment, and Dillon responded by yelling at her that he did. Appellee apologized, saying that she had not heard him or she would have done it. As Dillon was walking away, appellee muttered under her breath, "It's gonna be another one of those days." Hearing the remark, Dillon called appellee into his office and told her he was displeased with her attitude. When Dillon asked what her problem was, she told him that she was unhappy, but did not tell him why. Dillon stated that if she was unhappy, she should consider leaving. Appellee then quit.[1]

On January 6, 1994, appellee filed an application for unemployment benefits, stating on the application that she left appellant's employ because she was laid off. In response to a "Request to Employer for Separation Information," appellant, through Dillon, wrote that appellee was not fired but had quit her job; appellant added that appellee would be welcomed back provided that the problems between them were resolved. Appellee's initial request for benefits was denied on grounds that she had quit without just cause.

On February 16, 1994, appellee filed a request for reconsideration, raising several complaints against Dillon for the first time, including Dillon's frequent sexual comments and innuendos at the office. After reviewing the additional facts, the administrator affirmed the initial determination that appellee had quit without just cause and was therefore unentitled to benefits.

Appellee instituted an appeal to the Unemployment Compensation Board of Review ("board"). On July 22, 1994, a hearing was held, at which appellee described some of the sexual comments that Dillon had made to his employees. Under questioning from the hearing officer, appellee admitted that she had made an off-color joke about "peeping-toms" at the office, but couldn't remember if she had made one about a singer, Michael Jackson. Appellee also presented the testimony of one of her former co-workers to corroborate her account.

In a decision mailed August 3, 1994, the hearing officer noted that without question Dillon was guilty of sexual harassment in the workplace. However, he concluded that if the sexual harassment had been as egregious as appellee

---

1. Appellee did come back the next day and agreed to work for the final two weeks of the year.

claimed, she would not have stayed in appellant's employ for six years. Observing that appellee did not complain about the sexual harassment or any other problem in the workplace until after her initial request for benefits had been denied, the hearing officer found that appellee had quit her job because of the verbal reprimand she received on December 17, 1993, not because of the sexual harassment. Because the verbal reprimand did not give her just cause for quitting, the hearing officer affirmed the administrator's decision denying appellee benefits.

Appellee sought further appeal before the board, which was allowed. A second hearing was held on November 17, 1994, at which appellee provided additional testimony concerning Dillon's behavior at the workplace, including the fact that he would discuss his and his wife's sexual practices. Appellee also asserted that the December 17, 1993 incident was not the actual reason she left, but only the "straw that broke the camel's back[.]" When asked by the board's hearing officer why she did not simply ask Dillon to stop, appellee responded by insisting that if she had gone to Dillon and told him she disliked his sexual comments, he "would have probably, maybe he would've fired me, he would've told me to 'Get the hell out,' uh, or he would've treated me in such a way that I couldn't've worked."

In a decision mailed December 7, 1994, the board affirmed the decision of the initial hearing officer, though on different grounds. Although finding that throughout her employment appellee had been exposed to Dillon's sexual comments, which the average woman would find offensive, the board nevertheless concluded that appellee quit her job without just cause because she failed to notify Dillon she found his behavior offensive and made no demand that it cease. As to appellee's expressed fear she probably would have been fired if she had complained to Dillon about his comments, the board stated that if she had been discharged as a result of making a complaint, she would be entitled to receive unemployment compensation benefits; it further concluded that appellee's belief she would have been fired was only speculative.

Appellee appealed the board's decision to the common pleas court pursuant to R.C. 4141.28(O). The trial court reversed the board's decision, finding it unlawful, unreasonable and against the manifest weight of the evidence. Concluding that appellee had indeed quit because of the hostile environment brought on by Dillon's conduct, the common pleas court held that appellee was not required to give notice that she found Dillon's comments offensive and demand that he stop, since he was the only person to whom she could complain. Adding that appellee should not have had to wait for her employer to fire her where she already had good reason to quit, the common pleas court remanded the cause to the board

with instructions to grant appellee unemployment benefits for the period of her unemployment.

In its sole assignment of error, appellant argues that the board's decision finding that appellee had quit her job without just cause was not unlawful, unreasonable or against the manifest weight of the evidence, and the trial court therefore erred by reversing the board's just cause determination.

R.C. 4141.29(D)(2)(a) provides that individuals may not receive unemployment compensation benefits if they have quit their work without just cause. As the Ohio Supreme Court has stated, " '[t]here is, of course, not a slide-rule definition of just cause. Essentially, each case must be considered upon its particular merits. Traditionally, just cause, in the statutory sense, is that which, to an ordinarily intelligent person, is a justifiable reason for doing or not doing a particular act.' " *Irvine v. Unemployment Comp. Bd. of Review* (1985), 19 Ohio St.3d 15, 17, 19 OBR 12, 14, 482 N.E.2d 587, 589, quoting *Peyton v. Sun T.V.* (1975), 44 Ohio App.2d 10, 12, 73 O.O.2d 8, 9, 335 N.E.2d 751, 752. Claimant bears the burden of demonstrating that she had just cause for quitting under R.C. 4141.29(D)(2)(a). *Irvine, supra.*

■ Pursuant to R.C. 4141.28(O)(1), a common pleas court may only reverse a decision of the board if it is unlawful, unreasonable or against the manifest weight of the evidence. As to factual matters, the common pleas court is limited to determining whether the board's decision is supported by some competent, credible evidence going to all the elements of the controversy; if it is, it cannot be reversed as being against the manifest weight of the evidence. *Angelkovski v. Buckeye Potato Chips Co.* (1983), 11 Ohio App.3d 159, 161, 11 OBR 242, 243–244, 463 N.E.2d 1280, 1282–1283.

■ Moreover, the Ohio Supreme Court has recently indicated that, in reviewing the board's decision, common pleas courts and appellate courts are to employ the same standard, reversing the board's decision only if it is unlawful, unreasonable or against the manifest weight of the evidence. *Tzangas, Plakas & Mannos v. Ohio Bur. of Emp. Serv.* (1995), 73 Ohio St.3d 694, 696–697, 653 N.E.2d 1207, 1210–1211. All reviewing courts, from the common pleas court to the Ohio Supreme Court, "have the duty to determine whether the board's decision is supported by the evidence in the record." *Id.* at 696, 653 N.E.2d at 1210.

■ Application of the objective standard for just cause outlined in *Irvine, supra,* suggests an initial determination of *why* the claimant actually quit his or her job. Only when the board or one of its hearing officers makes a determination regarding the actual reason why an employee quit, can it then be determined if an ordinarily intelligent person would have quit for that reason.

■ The evidence presented to the board's original hearing officer supports two equally plausible views: (1) appellee quit because of the verbal reprimand she received, and used the claim of sexual harassment as a pretext, and (2) the reprimand was merely the "straw that broke the camel's back," with the primary, underlying reason for appellee's decision to quit being Dillon's harassment. The board's initial hearing officer determined that appellee quit because she was reprimanded on December 17, 1993, not because she was sexually harassed. The hearing officer's factual determination is supported by evidence that appellee stayed with appellant for six years and during that time did not raise the claim of sexual harassment until her initial request for benefits had been denied. Thus, the determination is not against the manifest weight of the evidence. Moreover, the initial hearing officer's conclusion that an employee who quits because of a verbal reprimand quits without just cause for purposes of R.C. 4141.29(D)(2)(a) is neither unlawful nor unreasonable. Thus, if the board had adopted the initial hearing officer's reasoning as its own or as an alternative rationale for denying appellee benefits, the trial court would have been unjustified in substituting its judgment for that of the board's simply because it viewed the evidence differently. *Angelkovski, supra.*

While the board affirmed the initial hearing officer's decision, it plainly did so on different grounds. Unfortunately, the board failed to explicitly determine why appellee quit her job. It, however, apparently found that appellee's exposure to Dillon's sexual comments was the primary reason behind her decision to leave, as the board focused on Dillon's sexual comments, which it found offensive to the average woman, rather than the verbal reprimand which appellee received. Accordingly, we must determine if the board's decision that appellee quit without just cause when she failed to provide Dillon with notice that she found his comments offensive was unlawful, unreasonable or against the manifest weight of the evidence.

In *Irvine, supra,* the Ohio Supreme Court held:

"An employee's voluntary resignation on the basis of health problems is without just cause within the meaning of R.C. 4141.29(D)(2)(a) when the employee is physically capable of maintaining a position of employment with the employer, but fails to carry her burden of proving that she inquired of her employer whether employment opportunities were available which conformed to her physical capabilities and same were not offered to her by the employer." *Irvine, supra,* 19 Ohio St.3d 15, 19 OBR 12, 482 N.E.2d 587, 588, at syllabus.

In *Irvine,* the court found that the record failed to demonstrate that claimant gave her employer "sufficient timely notice" of her medical restrictions so that it could find a less demanding position for her. *Id.* at 18, 19 OBR at 15, 482 N.E.2d at 590. When the foregoing excerpt is read in conjunction with its definition of

"just cause," *Irvine* found that an ordinarily intelligent person with a health problem would not quit his or her employment without first notifying his or her employer of the problem and thus giving the employer an opportunity to make suitable arrangements. See *Thake v. Unemp. Comp. Bd. of Review* (1990), 67 Ohio App.3d 503, 505–506, 587 N.E.2d 862, 863–864 (where claimant failed to give employer sufficient notice of her continuing problem, she quit without just cause and was therefore unentitled to unemployment benefits). See, also, *Wilson v. Ohio Bur. of Emp. Serv.* (Nov. 19, 1986), Summit App. No. 12651, unreported, 1986 WL 13852 (citing *Irvine,* court found that employee who quit because of employer's religious lectures and temperamental outbursts quit without just cause where employee failed to discuss problems with employer and to give employer an opportunity to correct them before quitting).

By contrast, courts have found employees to have quit with just cause where they have notified their employer of the problem before quitting, thereby giving the employers an opportunity to remedy it. Thus, in *Harmony v. Ohio Bur. of Emp. Serv.* (Mar. 28, 1990), Delaware App. No. 89–CA–28, unreported, 1990 WL 41580, the court found that an employee quit with just cause because her manager had "subjected her to verbal abuse in front of customers and actions tantamount to sexual harassment." There, the employee had "made reasonable efforts to deal with the problems" before quitting by speaking with the manager about his offensiveness; the manager, instead of dealing with the problem, told her she was going to be terminated in another week or two. See, also, *Taylor v. Bd. of Review* (1984), 20 Ohio App.3d 297, 299, 20 OBR 389, 391–392, 485 N.E.2d 827, 829 (claimant quit with just cause where he reported to his employer that a fellow employee was threatening him with physical harm, and the employer did not or could not take appropriate steps to alleviate claimant's reasonable fear).

 Given the foregoing, we are constrained to find under Ohio statutory law that generally employees who experience problems in their working conditions must make reasonable efforts to attempt to solve the problem before leaving their employment. Essentially, an employee must notify the employer of the problem and request that it be resolved, and thus give the employer an opportunity to solve the problem before the employee quits the job; those employees who do not provide such notice ordinarily will be deemed to have quit without just cause and, therefore will not be entitled to unemployment benefits.

The Supreme Court, however, did not establish a *per se* rule in *Irvine* that, absent such notice, claims for unemployment benefits must be denied. Circumstances exist when an employee should not be required to give an employer notice of a problem and an opportunity to solve it. For instance, an employee who is subjected to *physical* sexual harassment by her employer and has no one to whom she can report the incident but the harassing employer may not need to

give notice of the offensive conduct and wait for the employer to correct the problem before quitting. See, *e.g.*, *Doering v. Bd. of Review* (A.D.1985), 203 N.J.Super. 241, 496 A.2d 720. But, see, *Krawczyszyn v. Ohio Bur. of Emp. Serv.* (1989), 54 Ohio App.3d 35, 560 N.E.2d 807 (employee whose supervisor pinched and kissed her against her will on several occasions did not quit with just cause, since she did not pursue her employer's grievance procedures to correct the problem).

Thus, in applying the notice element of *Irvine*, the critical issue underlying whether an employee has quit with just cause is not whether notice was given, but rather whether an ordinarily intelligent person would have quit without giving notice under the circumstances of the case. See *Irvine, supra,* 19 Ohio St.3d at 17, 19 OBR at 14–15, 482 N.E.2d at 589–590. As a general rule, an ordinarily intelligent employee will not quit his or her job over a problem with working conditions without first bringing that problem to his or her employer's attention, requesting that it be solved, and thus giving the employer an opportunity to correct it. See *Irvine, Wilson,* and *Harmony, supra.* Nonetheless, circumstances can be envisioned where the general rule should not be dogmatically applied.

Here, the board applied the notice element of *Irvine* as a *per se* rule; it did not consider whether an ordinarily intelligent person would have quit without giving Dillon notice his conduct was offensive. In addressing the issue, the board needs to consider the nature of the problem, the person to whom appellee would need to address her concerns, and whether notice to that person would have been a futile act. At the same time, the board may consider the lack of notice as well as any other relevant evidence in evaluating the merit to appellee's claim that she quit because she was sexually harassed. See *Doering, supra.*

Relying on *Meritor Savings Bank, FSB v. Vinson* (1986), 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49, appellee contends that she should not be required to give notice to Dillon that she found his comments offensive. *Meritor,* however, involved a sexual harassment claim brought pursuant to Title VII of the Civil Rights Act of 1964 by a woman who alleged that her supervisor had sexually harassed her throughout her employment with the bank. The United States Supreme Court found that the bank's grievance procedure, which the woman had failed to use, did not necessarily insulate the bank from liability, especially since the bank's grievance procedure required the woman to complain first to the very supervisor who allegedly had been harassing her. Appellee invites us to adopt this principle, applicable in sexual harassment lawsuits under Title VII, to claims for unemployment compensation predicated on assertions that a sexually harassed employee had just cause to quit. We decline the invitation.

The *Irvine* court emphasized that just cause determinations must be made in conjunction with the underlying purposes of the Unemployment Compensation Act. *Irvine, supra,* 19 Ohio St.3d at 17, 19 OBR at 14–15, 482 N.E.2d at 589–590. The court found that the Act was intended to aid individuals who, through no fault or agreement of their own, were temporarily unemployed. *Id.,* citing *Salzl v. Gibson Greeting Cards* (1980), 61 Ohio St.2d 35, 39, 15 O.O.3d 49, 51–52, 399 N.E.2d 76, 79. Generally, a person who quits because of a problem with working conditions without first notifying the employer of the problem cannot be said to have become unemployed through no fault or agreement of his or her own, and thus does not quit with just cause for purposes of R.C. 4141.29(D)(2)(a).

For the foregoing reasons, we reverse the judgment of the common pleas court and instruct the common pleas court to remand the matter to the board for consideration of appellee's claim under the standard set forth in this opinion.

*Judgment reversed*
*and cause remanded.*

BOWMAN and CLOSE, JJ., concur.