{¶ 1} This timely appeal comes for consideration upon the record in the trial court and the parties' briefs. Claimant-Appellant, Opal Morris, appeals the decision of the Columbiana County Court of Common Pleas which found the decision of the Unemployment Compensation Review Commission denying Morris' unemployment compensation claim was not unlawful, unreasonable, or against the manifest weight of the evidence. The issue before us is whether the Commission erred when it determined that Morris quit her employment without just cause. Because we conclude the Commission's findings of fact were supported by competent, credible evidence and its ultimate conclusion is not unlawful, unreasonable, or against the manifest weight of the evidence, we affirm the trial court's decision.
 {¶ 2} Morris' claims are based upon two incidents that occurred during her employment with Sterling China Company. Sometime near the end of the summer in 1998, one of Morris' co-workers, Larry Galloway solicited another co-worker, Rene Siderich to beat up Morris. Siderich refused and told Morris' boyfriend who then told Morris. Morris did not know about the incident until the summer of 1999. Siderich did not inform management at Sterling about the solicitation until July 1999.
 {¶ 3} The second incident arose sometime in February 1999 before Morris heard about Galloway's actions. Morris called a co-worker who was a friend of hers, Jennifer Chers, and left a message on her answering machine. After Morris finished leaving the message she failed to disconnect the line and proceeded to have a conversation with her mother. During that conversation, Morris discussed various medical problems she was having and mentioned that maybe she should submit to an HIV test. According to Chers, she was unable to determine who was on the recording. She thought the tape was saying one of her friend's brothers was engaged to someone who had AIDS. Thus, the next day she brought the tape to work and played it for some co-workers so her friend could know about this and tell her brother. One of the people who heard the tape identified the voice on the tape as Morris' voice.
 {¶ 4} Morris was greatly embarrassed that Chers chose to play the tape at work in front of their co-workers. Three days after the tape was played, Morris told Chers she was going to sue for slander. After this Chers began to call Morris names such as "AIDS infested whore" and "fucking bitch". Morris also claimed Chers wrote "Opal's infested AIDS" in blood on a bathroom stall door and wrote "AIDS kills" in black magic marker on another bathroom stall. However, she never saw Chers write either of these things and is assuming Chers did so. All these events happened in 1999.
 {¶ 5} Morris complained to Sterling's management about Chers' behavior in 1999 and claims Sterling never investigated her complaints. However, at the same time she acknowledges the plant manager spoke to Chers about her behavior. Sterling claims the plant manager looked into the allegations and found them unsubstantiated. Sterling also claimed they never heard Morris was called an "AIDS infested whore" or heard about the bathroom graffiti. Sterling's human resources director, Michael Somerville, had also seen other graffiti on site saying things like "smoking kills" and "abortion is murder". Although Sterling found Morris' claims to be unsubstantiated, it attempted to keep Chers and Morris apart per Morris' request by scheduling them on different shifts or making sure they worked on different floors. Sterling also instructed its managers to be vigilant of any alleged harassment of Morris.
 {¶ 6} According to Morris, Sterling's efforts to resolve the situation were inadequate. She claims when she and Chers did work together at night, Chers would make an effort to see Morris so she could harass her. She thought it seemed like Sterling "stuck" the two of them together. At one point, Morris filed a complaint in the Columbiana County Court of Common Pleas seeking an anti-stalking restraining order against Chers. That court found both parties had been harassing each other and that Chers had been inconsiderate toward Morris, but that Chers had not been stalking Morris. The court admonished the parties "to stay as far away from each other as possible." Morris also contacted the Northeast Ohio Legal Services about her problems with Chers at work. That organization wrote to Sterling on behalf of Morris.
 {¶ 7} Morris claims the stress and nervous tension caused by Chers' harassment aggravated her irritable bowel syndrome. At one time in 2000, Morris' doctor advised she be placed on "light duty" at work because she was having up to twenty bowel movements per work day. Sterling did not have any positions which could accommodate someone needing fifteen to twenty restroom breaks during a shift and denied the request.
 {¶ 8} On August 24, 2000, Morris filed an application with Sugardale Foods seeking new employment, was hired three days later, and would start working on September 11, 2000. It was agreed that she would work the midnight shift for Sugardale so she could go to school during the day.
 {¶ 9} On August 30, 2000, Morris sought to give Sterling her two-weeks notice. Sterling explained to Morris that once she signed a voluntary termination form it had the option of terminating her employment prior to the end of the two week period. Morris saw no point in signing the form if Sterling could release her before the end of the two week period and tendered her immediate resignation. Morris began to work for Sugardale on September 11, 2000, as planned, but lost her job soon thereafter because her position was downsized. She had also enrolled in school the day before she quit her employment with Sterling.
 {¶ 10} After losing her job at Sugardale, Morris filed an application for determination of unemployment compensation benefit rights seeking benefits since her resignation from Sterling. The Ohio Department of Job and Family Services disallowed Morris' claim for benefits, finding Morris quit her employment without just cause. After availing herself of all administrative appeals, both in the Department of Job and Family Services and in the Commission, Morris appealed to the Columbiana County Court of Common Pleas and the parties briefed the matter. The trial court affirmed the Commission's decision which disallowed her claim for benefits, finding it was not unlawful, unreasonable, or against the manifest weight of the evidence.
 {¶ 11} We affirm the trial court's decision because we conclude the Commission's decision denying Morris unemployment compensation benefits was not unlawful, unreasonable, or against the manifest weight of the evidence. Morris can only receive unemployment compensation benefits if she quit her employment with Sterling for just cause and she bears the burden of establishing her claim to those benefits. After reviewing the evidence, a reasonable person could have concluded Morris did not quit her employment with Sterling for any justifiable reason. Quitting one job in order to begin employment at a new job or to attend school is not quitting employment for just cause. In addition, the apparent connection between the problems Morris experienced with her co-workers and her decision to quit her employment seems tenuous at best and the evidence supports the Commission's decision finding her claims about those problems were greatly exaggerated and, thus, an ordinary, intelligent person would not have quit their employment for that reason.
 {¶ 12} Morris' sole assignment of error asserts:
 {¶ 13} "The Common Pleas erred in affirming the Unemployment Compensation Review Commission's decision that Appellant quit her employment without just cause because the Unemployment Review Commission's decision is unlawful, unreasonable, and against the manifest weight of the evidence."
 {¶ 14} A claimant bears the burden of proving his or her entitlement to unemployment compensation benefits. Irvine v. Unemp.Comp. Bd. of Review (1985), 19 Ohio St.3d 15, 17, 19 OBR 12,482 N.E.2d 587. Pursuant to R.C. 4141.282, which was the effective statute at the time the matter was appealed to the trial court, Coughlinv. Ohio Bur. Of Emp. Serv (Apr. 10, 2002), 9th Dist. No. 01CA007933, at 2, footnote 2, any interested party may appeal the final decision of the Commission awarding or denying unemployment compensation benefits to the Court of Common Pleas. The trial court may reverse the Commission only when it finds the decision to be "unlawful, unreasonable or against the manifest weight of the evidence." R.C. 4141.282(H).
 {¶ 15} On appeal, this court applies the same standard of review as the trial court and the Commission's decision may only be reversed if it is unlawful, unreasonable, or against the manifest weight of the evidence. Tzangas, Plakas Mannos v. Ohio Bur. of Emp. Serv.
(1995), 73 Ohio St.3d 694, 653 N.E.2d 1207, paragraph one of the syllabus. "This standard of review is inherently limited. Neither the common pleas court nor the court of appeals is permitted to make factual findings or determine the credibility of witnesses." Wilson v. Matlack,Inc. (2000), 141 Ohio App.3d 95, 99, 750 N.E.2d 170, citing Irvine at 17. "[W]hile appellate courts are not permitted to make factual findings or to determine the credibility of witnesses, they do have the duty to determine whether the board's decision is supported by the evidence in the record." Tzangas at 696. Applying this standard of review on all levels does not affect the Commission's position as fact-finder because "the fact that reasonable minds might reach different conclusions is not a basis for reversal of the board's decision." Id. at 697. If the Commission's factual determinations are supported by competent, credible evidence, this court must accept those findings. DiGiannantoni v.Wedgewater Animal Hosp., Inc. (1996), 109 Ohio App.3d 300, 305,671 N.E.2d 1378.
 {¶ 16} In this case, the Commission denied Morris unemployment compensation benefits because it concluded she quit her employment without just cause. According to R.C. 4141.29(D)(2)(a), any person, with a few exceptions that do not apply to Morris, who quits work without just cause is ineligible for unemployment compensation benefits. Ford MotorCo. v. Ohio Bur. of Emp. Servs. (1991), 59 Ohio St.3d 188, 189,571 N.E.2d 727. "`[T]here is, of course, not a slide-rule definition of just cause. Essentially, each case must be considered upon its particular merits. Traditionally, just cause, in the statutory sense, is that which, to an ordinarily intelligent person, is a justifiable reason for doing or not doing a particular act.'" Irvine at 17, quoting Peyton v.Sun T.V. (1975), 44 Ohio App.2d 10, 12, 73 O.O.2d 8, 335 N.E.2d 751. When determining whether an employee quit work without just cause, courts must analyze the particular circumstances of the case in conjunction with the legislative purpose underlying the Unemployment Compensation Act. Id.
 {¶ 17} "Essentially, the Act's purpose is `to enable unfortunate employees, who become and remain involuntarily unemployed by adverse business and industrial conditions, to subsist on a reasonably decent level and is in keeping with the humanitarian and enlightened concepts of this modern day.' (Emphasis sic.) Leach v. Republic Steel Corp. (1964),176 Ohio St. 221, 223, 199 N.E.2d 3 [27 O.O.2d 122]; accord Nunamaker v.United States Steel Corp. (1965), 2 Ohio St.2d 55, 57, 206 N.E.2d 206
[31 O.O.2d 47]. Likewise, `[t]he act was intended to provide financial assistance to an individual who had worked, was able and willing to work, but was temporarily without employment through no fault or agreement of his own.' Salzl v. Gibson Greeting Cards (1980),61 Ohio St.2d 35, 39, 399 N.E.2d 76 [15 O.O.3d 49]." Id.
 {¶ 18} Because of the purpose behind the Act, fault on behalf of the employee is an essential component of a just cause termination.Tzangas at paragraph two of the syllabus.
 {¶ 19} "Application of the objective standard for just cause outlined in Irvine, supra, suggests an initial determination of why the claimant actually quit his or her job. Only when the board or one of its hearing officers makes a determination regarding the actual reason why an employee quit, can it then be determined if an ordinarily intelligent person would have quit for that reason." (Emphasis sic.) DiGiannantoni at 305.
 {¶ 20} In this case, the Commission found Morris quit her employment with Sterling for four reasons: 1) a co-worker solicited another co-worker to harm her; 2) problems resulting from her relationship with Chers at work; 3) her desire to go work for another employer; and, 4) her desire to attend school. Generally, neither quitting work with one employer to accept work for another nor quitting work to attend school is considered to be quitting work for just cause as contemplated by R.C. 4141.29(D)(2)(a). See Radcliffe v. ArtromickIntern, Inc. (1987), 31 Ohio St.3d 40, 41, 31 OBR 148, 508 N.E.2d 953;Jones v. Unemp. Comp. Bd. of Review (1989), 61 Ohio App.3d 272,572 N.E.2d 744. Thus, the only reasons Morris may have quit for just cause relate to the problems she had with her co-workers.
 {¶ 21} The Commission found the solicitation incident wherein Galloway offered Siderich money to harm Morris "occurred approximately two years before claimant quit. It does not appear the employee who was asked to harm claimant acted on that request. Further, the employer investigated the situation when it was brought to its attention. That situation did not reasonably justify claimant's quitting." The facts show that the solicitation occurred soon after the summer in 1998, two years before Morris quit her employment with Sterling. Although Siderich refused to act upon the request to harm Morris, Morris did not find out about it until after the tape-playing incident. Accordingly, Morris mistakenly believed the two incidents were related. Although there must have been some reason why Galloway would have wanted harm to come to Morris, we cannot tell from the record what that reason was. Furthermore, the evidence shows Galloway never bothered making sure he or anyone else ever actually harmed Morris. Accordingly, the Commission's conclusion that the underlying problem between Galloway and Morris was solved and the incident would not be just cause for her to quit her employment with Sterling was supported by competent, credible evidence.
 {¶ 22} Morris' main argument that she quit for just cause relates to the problems resulting from her relationship with Chers. According to Morris, under the circumstances in this case any ordinary, intelligent person would be justified in quitting his or her employment. Clearly harassment in the work environment can be just cause for an employee to quit working for a particular employer. See DiGiannantoni, supra; Heinzev. Giles (1990), 69 Ohio App.3d 104, 590 N.E.2d 66; Krawczyszyn v. OhioBur. of Emp. Serv. (1989), 54 Ohio App.3d 35, 560 N.E.2d 807. However, employees who experience problems in their working conditions must make reasonable efforts to attempt to solve the problem before leaving their employment. DiGiannantoni at 307.
 {¶ 23} As a general rule, employees experiencing problems in their working conditions must notify the employer of the problem, request it be resolved, and give the employer an opportunity to solve the problem before a court will find just cause for quitting work. Id.; King v. StateFarm Mut. Auto Ins. Co. (1996), 112 Ohio App.3d 664, 669-670,679 N.E.2d 1158; see Irvine at 18. "An employee who resigns before providing her employer with a reasonable opportunity to correct offensive conduct in the workplace risks quitting her employment without just cause." Krawczyszyn at 37.
 {¶ 24} Courts do not always require that an employee must notify his or her employer if the circumstances justify the employee's choice not to notify the employer of the problem. DiGiannantoni at 308. For instance, if an employee notifies the employer of a problem and requests the employer remedy the situation, but the employer fails to remedy the situation, the employee may be relieved of her duty to further pursue internal remedies. Krawczyszyn at 37. Likewise, "an employee need not indefinitely subject herself to abusive conduct while waiting for her employer to respond." Id. However, although an employee may be justifiably outraged at a co-worker's conduct, that conduct may not provide a sufficient basis for the employee to terminate her employment and to receive unemployment compensation benefits if an ordinary, intelligent person would not have quit their employment for that reason.Jenkins v. State, Unemployment Compensation Review Com'n (Nov. 13, 2000), 4th Dist. No. 00CA11 at 4. A mere perception by an employee that she has been subject to harassment does not constitute just cause for quitting employment. Biles v. Ohio Bur. of Emp. Serv. (1995),107 Ohio App.3d 114, 122, 667 N.E.2d 1244.
 {¶ 25} In its decision, the Commission found as follows:
 {¶ 26} "Claimant has indicated she quit because she was being harassed by one co-worker * * *. The employer acted reasonably, when it became aware of the problem between claimant and the co-worker, in scheduling them to work different shifts or in different areas. In that that occurred, claimant's representation that she was harassed by the co-worker on a daily basis appears to be significantly exaggerated. Although it appears there were times the co-worker made derogatory comments to and about claimant, the evidence of record does not establish that situation was so bad as to reasonably justified [sic] claimant's quitting."
 {¶ 27} The key issue before this court is whether, under the circumstances of this case, any ordinary and intelligent person would have acted in the same manner as Morris. Morris claims she was subjected to Chers' harassment on a daily basis, even after she spoke to the management at Sterling. The evidence in the record supports the Commission's finding that Morris' claims are "significantly exaggerated." Somerville testified that management spoke to the principals involved in the harassment and alleged witnesses to the harassment and found Morris' allegations unsubstantiated. However, Sterling complied with Morris' request and attempted to schedule her and Chers on different shifts. It also instructed management staff members to keep an eye on Chers and Morris in an attempt to witness any harassment themselves, but those managers never saw anything.
 {¶ 28} Out of the thirty-five weeks Morris worked at Sterling during 2000, she and Chers only worked the same shift during eight of those weeks. During those times they always worked in different areas and floors. During five of those weeks, the two worked the first shift. During the other three weeks, the two worked the second shift. They never worked the third shift together during 2000, a time when no supervisor would have been on site to manage the work and their interactions. Thus, according to Sterling's evidence, once the company knew of the problem between Chers and Morris, Chers only had limited opportunity to harass Morris. Finally, Morris' own testimony is that the most abusive instances happened in 1999. It does not appear to be against the manifest weight of the evidence for the Commission to find that any harassment Morris did suffer during this time was not so bad as to reasonably justify her choice to quit working at Sterling. This is especially true when one takes into consideration the Commission's finding that Morris quit her job in order to work another job and to attend school. For all of these reasons, the Commission's finding that Chers' conduct toward Morris did not provide Morris with just cause to quit her employment with Sterling was supported by competent, credible evidence.
 {¶ 29} Because the Commission's findings of fact were all supported by competent, credible evidence, there is no basis upon which the Commission could have found Morris quit her employment with Sterling for just cause. Thus, it's ultimate decision that Morris was not entitled to unemployment compensation benefits was correct and the trial court's decision is affirmed.
Donofrio, J., concurs.
Waite, J., concurs.