**SHEPHARD, Appellant,**

**v.**

**OHIO DEPARTMENT OF JOB AND FAMILY SERVICES, et al., Appellees.**

[Cite as *Shephard v. Ohio Dept. of Job & Family
Servs.*, 166 Ohio App.3d 747, 2006-Ohio-2313.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 86518.

Decided May 11, 2006.

---

Jillian S. Davis, for appellants.

Jim Petro, Attorney General, and Patrick MacQueeney, Assistant Attorney General, for appellees.

CHRISTINE T. McMONAGLE, Judge.

{¶ 1} Appellant, Martha Shephard, appeals from the judgment of the common pleas court, which affirmed the finding of the Unemployment Compensation Review Commission (the "commission") that she quit her job without just cause and is therefore not entitled to unemployment benefits. We affirm.

{¶ 2} Shephard filed an application for unemployment compensation with appellee, Director, Ohio Department of Job and Family Services. Appellee issued an initial determination of benefits granting the claim, finding that Shephard quit her employment with just cause due to a medical condition. The employer, Economy Enterprises, Inc., d.b.a. Nielsen's Stores, appealed this determination; appellee subsequently issued a redetermination that affirmed its earlier decision. The employer appealed the redetermination and the Director transferred jurisdiction to the commission, which assigned the matter to a hearing officer.

{¶ 3} Shephard and Jack Trombley, Vice–President of Economy Enterprises, Inc., testified at the hearing. Shephard was employed from October 1999 through February 2004 as an assistant manager/cashier at Nielsen's convenient store in the Diamond Building. Her duties included receiving and putting away deliveries, stocking and cleaning the shelves, and waiting on customers.

{¶ 4} Shephard testified that when she was hired, she informed Nielsen's about problems she had with her right knee. In 2001, she submitted a doctor's statement to Nielsen's that indicated that she needed two 15–minute breaks each day due to her knee problems. Shephard testified that she was never able to take her required breaks, however, because of the volume of work she was expected to perform. Shephard testified further that the only accommodation her employer ever made for her was to provide her with two milk crates to sit on

when there were no customers in the store. She admitted, however, that she never told Trombley that she was not getting enough time to sit during the day, even though he visited the store several times each month.

{¶ 5} In September 2003, Shephard began experiencing problems with her right foot. She saw a doctor in October 2003 regarding her condition and learned that she had a heel spur. Shephard admitted that she told Dawn Swartwood, Nielsen's area manager, that she was having problems with her foot, but did not ask for any special accommodation in light of her condition.

{¶ 6} On January 14, 2004, Shephard submitted a letter of resignation that stated, "I Martha Shephard will no longer work for Nielsen's as of Feb. 6, 2004 after 2:30 p.m., due to pay rate and medical reasons. (R. Foot)."

{¶ 7} Shephard testified that she quit her job because of her health. According to Shephard, the condition with her foot "had got so unbearable, it was kind of hard for me to even stand or walk on it. I couldn't perform the duties of standing * * * which that job called for."

{¶ 8} The record indicates that prior to February 6, 2004, the effective date of her resignation, Shephard presented no medical evidence to Nielsen's indicating that she was physically unable to work at her job. Instead, the record reflects that Shephard submitted a letter dated January 28, 2004 from Dr. Robert T. Bair, in which Dr. Bair advised that Shephard was examined on January 28, 2004, and cleared to return to work as of that date.

{¶ 9} After filing her claim, Shephard submitted a letter to appellee from Dr. Carl Robson. The letter, which was dated February 17, 2004, indicated that Dr. Robson was treating Shephard for degenerative arthritis and plantar fasciitis and that he had recommended that she quit her job because it involved "standing 8 hours, with much walking" and "she is unable to continue with this work."

{¶ 10} Shephard testified that her resignation letter mentioned her pay rate because she was having a hard time paying her medical bills out-of-pocket. She testified that "a raise would have helped me some," but insisted that she quit her job because of her health, not because of the pay. Shephard admitted that she had asked Trombley for a raise, but had never told him that she needed a raise due to her medical bills.

{¶ 11} Trombley testified that when Shephard informed Nielsen's in 2001 of her knee problems, the company made arrangements to accommodate her by allowing her to sit during the day, even though the company generally does not like its employees to sit because of the image it presents to customers. Trombley testified further that the company would have been willing to make other accommodations for Shephard, but she never asked him for any accommodation regarding her foot problems. He admitted, however, that it would have been

futile for Shephard to ask for a position where she did not have to be on her feet at all, because "we don't have positions for that." Finally, Trombley testified that Shephard asked him about a raise several times, but never mentioned that her requests were related to her medical bills.

{¶ 12} The hearing officer subsequently issued a written decision modifying the Director's redetermination and concluding that Shephard had quit her employment without just cause. He stated:

{¶ 13} "Claimant contends that she quit her employment with Economy Enterprises because she was no longer able to perform her duties as an Assistant Manager as the result of a heel spur on [her] right foot. The evidence, however, indicates that claimant was more concerned with her rate of pay than her foot. While claimant discussed her pay with the Vice–President on multiple occasions, she never broached the subject of accommodations with him before resigning.

{¶ 14} "Even if her foot was the principal reason for claimant's resignation, by failing to inquire about accommodations for her condition, claimant did not take all of the steps reasonably available to her to maintain her employment before quitting."

{¶ 15} In light of his finding that Shephard quit without just cause, the hearing officer concluded that she was not entitled to unemployment compensation. In addition, he concluded that Dr. Robson had indicated that Shephard was unable to work and, accordingly, disallowed her claim for the weeks following her resignation.

{¶ 16} The commission subsequently disallowed Shephard's request for review. Shephard then filed an appeal with the common pleas court, which affirmed the commission's decision to deny unemployment benefits to Shephard on the basis that she had quit her employment without just cause. Shephard timely appealed the trial court's judgment.

{¶ 17} In her first assignment of error, Shephard contends that the trial court erred in affirming the denial of unemployment benefits because she had quit her job with just cause.

{¶ 18} Unlike most administrative appeals in which we employ an abuse-of-discretion standard, see *Lorain City School Dist. Bd. of Edn. v. State Emp. Relations Bd.* (1988), 40 Ohio St.3d 257, 260–261, 533 N.E.2d 264, our standard of review on appeal from a decision of the commission is the same as that of the common pleas court. This court "may reverse the board's determination only if it is unlawful, unreasonable, or against the manifest weight of the evidence." *Tzangas, Plakas & Mannos v. Ohio Bur. of Emp. Servs.* (1995), 73 Ohio St.3d 694, 697, 653 N.E.2d 1207. In making this determination, we must give deference to the commission in its role as finder of fact. *Irvine v. Unemp.*

*Comp. Bd. of Review* (1985), 19 Ohio St.3d 15, 18, 19 OBR 12, 482 N.E.2d 587. We may not reverse the commission's decision simply because "reasonable minds might reach different conclusions." Id. On close questions, when the board might reasonably decide either way, we have no authority to upset the agency's decision. Id. Instead, our review is limited to determining whether the commission's decision is unlawful, unreasonable, or totally lacking in competent, credible evidence to support it. Id.

{¶ 19} R.C. 4141.29(D)(2)(a) provides that an individual may not obtain unemployment benefits if he "quit his work without just cause." Traditionally, just cause is that which, to an ordinarily intelligent person, is a justifiable reason for doing or not doing a particular act. *Irvine,* supra, at 17, 482 N.E.2d 587. The determination of whether just cause exists depends on the "unique factual considerations" of a particular case and is, therefore, primarily an issue for the trier of fact. Id.

{¶ 20} Initially, we note that it is well established that the burden of proof in an unemployment compensation case is on the employee to prove that she was discharged by her employer without just cause, or quit work with just cause, and is therefore entitled to unemployment benefits under R.C. 4141.29(D)(2)(a). Accordingly, we reject Shephard's contention that the burden in this case was on her employer to demonstrate that she quit without just cause.

{¶ 21} We also reject Shephard's argument that the hearing officer was required to give more weight to her testimony than Trombley's because R.C. 4141.46 provides that the provisions of the Unemployment Compensation Act are to be liberally construed. "The agency and the court have a duty to construe the statute liberally for the claimant's benefit." *Dailey v. Ohio Bur. of Emp. Servs.* (Jan. 22, 1987), Cuyahoga App. No. 52633, 1987 WL 5642. "However, neither the agency nor the court has a duty to construe the facts more favorably to either party." Id.

{¶ 22} Finally, we reject Shephard's argument that Trombley's testimony should have been disregarded because it was hearsay. It is well settled that a referee may use hearsay evidence in making unemployment compensation decisions because, as a general rule, administrative agencies are not bound by the strict rules of evidence applied in a court. *Cully v. Ohio Bur. of Emp. Servs.* (Oct. 13, 1994), Cuyahoga App. No. 66187, 1994 WL 568342.

{¶ 23} Moreover, Trombley's testimony was not all hearsay. Trombley's testimony about his conversations with Shephard regarding her requests for a raise was obviously based on his personal knowledge of these conversations.

{¶ 24} Turning to the merits of her claim, Shephard argues that she quit her job with just cause because she was in intense pain and unable to stand on her feet, as required by her job. She argues that "any ordinary, intelligent person experiencing the same pain and discomfort would have felt driven to leave the job," as she did. She argues further that she quit with just cause because her employer knew of her condition, but failed to accommodate her.

{¶ 25} The record is clear that Shephard was indeed experiencing significant pain as a result of her arthritis and heel spur. The record is also clear, however, that before she quit, Shephard never asked Nielsen's to accommodate the condition with her heel spur.

{¶ 26} "[G]enerally[,] employees who experience problems in their working conditions must make reasonable efforts to attempt to solve the problem before leaving their employment. Essentially, an employee must notify the employer of the problem and request it be resolved, and thus give the employer an opportunity to solve the problem before the employee quits the job; those employees who do not provide such notice ordinarily will be deemed to quit without just cause and, therefore will not be entitled to unemployment benefits." *DiGiannantoni v. Wedgewater Animal Hosp., Inc.* (1996), 109 Ohio App.3d 300, 307, 671 N.E.2d 1378.

{¶ 27} Employees who quit for medical reasons are no exception to the general rule. As the Ohio Supreme Court held in *Irvine,* 19 Ohio St.3d 15, 19 OBR 12, 482 N.E.2d 587:

{¶ 28} "An employee's voluntary resignation on the basis of health problems is without just cause within the meaning of R.C. 4141.29(D)(2)(a) when the employee is physically capable of maintaining a position of employment with the employer, but fails to carry her burden of proving that she inquired of her employer whether employment opportunities were available which conformed to her physical capabilities and same were not offered to her by the employer." Id. at syllabus.

{¶ 29} Here, the record is clear that Shephard never gave Nielsen's an opportunity to make any special arrangements for her before she quit her job. She admitted that although she told Nielsen's area manager about the problems with her heel spur, she never requested that Nielsen's make any special accommodation for her in light of her condition. Moreover, although she spoke with Trombley several times about her need for a raise, she never told him about the medical problems with her right foot. Furthermore, although Dr. Robson had apparently recommended that Shephard quit her job, Shephard did not provide any medical documentation regarding the severity of her condition to Nielsen's.

{¶ 30} *"Irvine* found that an ordinarily intelligent person with a health problem would not quit his or her employment without first notifying his or her employer of the problem and thus giving the employer an opportunity to make suitable arrangements." *DiGiannantoni,* 109 Ohio App.3d at 307, 671 N.E.2d 1378.

{¶ 31} Because Shephard failed to establish that she had notified Nielsen's of her problem and given it an opportunity to make suitable arrangements for her before she quit, we find that the commission's decision was not unlawful, unreasonable, or against the manifest weight of the evidence.

{¶ 32} Appellant's first assignment of error is overruled.

{¶ 33} In her second assignment of error, Shephard argues that the trial court erred in affirming the hearing officer's decision that she was unavailable for work in the weeks following her resignation and therefore not entitled to unemployment compensation. Our resolution of Shephard's first assignment of error renders this assignment of error moot and therefore we need not address it.

{¶ 34} Appellant's second assignment of error is overruled.

Judgment affirmed.

COONEY, P.J., concurs.

KILBANE, J., dissents.

MARY EILEEN KILBANE, Judge, dissenting.

{¶ 35} I respectfully dissent from the majority opinion and would reverse the judgment of the common pleas court.

{¶ 36} I agree with the majority that an individual may not obtain unemployment benefits if the employee quits work without just cause. R.C. 4141.29(D)(2)(a). "Just cause" is a justifiable reason for doing or not doing a particular act, and is measured by an ordinarily intelligent person standard. *Peyton v. Sun T.V. & Appliances* (1975), 44 Ohio App.2d 10, 73 O.O.2d 8, 335 N.E.2d 751. " 'There is, of course, not a slide-rule definition of just cause. Essentially, each case must be considered upon its particular merits. Traditionally, just cause, in the statutory sense, is that which, to an ordinarily intelligent person, is a justifiable reason for doing or not doing a particular act.' " *Irvine v. Unemp. Comp. Bd. of Review* (1985), 19 Ohio St.3d 15, 17, 19 OBR 12, 482 N.E.2d 587, quoting *Peyton,* supra.

{¶ 37} When determining whether an employee quit work without just cause, courts must analyze the particular circumstances of the case in conjunction with the legislative purpose underlying the Unemployment Compensation Act. Id.

{¶ 38} As a general rule, employees experiencing problems in their working conditions must notify the employer of the problem, request that it be resolved, and give the employer an opportunity to solve the problem before a court will find just cause for quitting work. *King v. State Farm Mut. Auto Ins. Co.* (1996), 112 Ohio App.3d 664, 669–670, 679 N.E.2d 1158. "An employee who resigns before providing her employer with a reasonable opportunity to correct offensive conduct in the workplace risks quitting her employment without just cause." *Krawczyszyn v. Ohio Bur. of Emp. Servs.* (1989), 54 Ohio App.3d 35, 37, 560 N.E.2d 807.

{¶ 39} However, courts do not always require an employee to notify his or her employer if the circumstances justify the employee's choice not to notify the employer of the problem. *DiGiannantoni v. Wedgewater Animal Hosp., Inc.* (1996), 109 Ohio App.3d 300, 308, 671 N.E.2d 1378. For instance, if an employee notifies the employer of a problem and requests that the employer remedy the situation and the employer fails to do so, the employee may be relieved of her duty to further pursue internal remedies. *Krawczyszyn,* supra.

{¶ 40} Moreover, although R.C. 4141.29(D)(2)(a) disqualifies a claimant who "quit his work without just cause" from collecting unemployment compensation benefits, R.C. 4141.46 requires that the unemployment compensation laws be liberally construed in favor of the applicant. See, also, R.C. 4141.46; R.C. 4141.29(J); and *Vespremi v. Giles* (1980), 68 Ohio App.2d 91, 22 O.O.3d 102, 427 N.E.2d 30.

{¶ 41} Shortly after beginning work in 1999, Shephard complained of knee problems that required her to take breaks and sit often. In response, she was given two milk crates to use as a chair during any break periods. Although Shephard was able to use the milk crates to sit on during work hours, she refutes any statement that after complaining of a knee injury in 1999, she was given a "chair" to use during working hours. Shephard testified that although she provided her then area manager, Jerry Hauser, with an excuse from Dr. Bilfield in November 2001 requiring two 15-minute breaks, she could only intermittently use the two crates to sit, and could never take scheduled breaks.

{¶ 42} In September 2003, Shephard began having additional medical difficulties and was experiencing severe pain in her foot, which was ultimately diagnosed as a heel spur. After receiving the diagnosis, Shephard informed her area manager, Dawn Swartwood.

{¶ 43} Shephard also testified that she gave Swartwood two letters, one from Dr. Bair and one from Dr. Robson stating that she suffered from heel spurs. Trombley's later testimony supported both this assertion and Shephard's earlier medical complaints when he admitted receiving doctors' statements from She-

phard regarding her knee in 2001 and 2002, and regarding her heel in January 2004.

{¶ 44} There have been repeated assertions that either Shephard did not inform her employer of her need for an accommodation or conversely, that when she did inform her employer of a medical need, the request was met with a sufficient accommodation. Upon direct questioning from Trombley at Shephard's hearing, Trombley stated, "And we have told you at times, because it's certainly in writing from your doctor, but even since then, that even though we don't provide a seat per se, the milk crates, which is what most of the employees end up doing anyway, were there for you to take breaks with if you needed them; is that right?" Shephard agreed that the milk crates were there if she needed them, but during the course of her duties, she rarely had a chance to use the crates.

{¶ 45} The record also contains a March 17, 2004 e-mail from Jack Trombley stating, "[Martha] told us she was supposed to stay off of her feet occasionally and we told her she could sit (not allowed by other personnel) whenever she felt it necessary." He also stated that, "[d]espite our willingness to work with Martha, she voluntarily quit."

{¶ 46} Further, in response to the ODJFS's request for information, Trombley stated, "The most recent medical problems appeared to be her foot. She had previously and through most of her time with us, told us about 'leg' problems (some documentation in file concerning her knees). We had accommodated her by allowing her to sit as necessary behind the sales counter (not allowed with other employees)."

{¶ 47} While Trombley repeatedly argued that the company would have been willing to help Shephard in any way, in the over four years of her employment and despite receiving several medical reports, Shephard was only offered two milk crates to use as a chair. If such treatment qualifies as "reasonable accommodation," what other indication is there that if Shephard had continued to complain she would have received something greater than milk crates?

{¶ 48} It is also noteworthy that after Shephard filed her claim for workers' compensation, the initial examiner specifically found that Shephard quit her employment due to personal injury/illness. The examiner found that Shephard provided documentation to her employer, that her employer knew of her medical problems, and that Shephard's personal physician had advised her to resign. After making these findings, the examiner determined that Shephard had quit with just cause. Although the majority focuses on the subsequent denials of Shephard's claim, initially, this was not the case.

{¶ 49} For these reasons, I believe that Shephard's notification to her employer of her continued medical problems, coupled with her employer's unwillingness to provide her with anything other than a make-shift chair, qualified as a resignation with just cause. I would, therefore, reverse the decision of the trial court.